**Alonzo FERGUSON, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. C9–01–1498.

Supreme Court of Minnesota.

June 13, 2002.

Joseph Margulies, Margulies & Richman, plc, Minneapolis, MN, Attorneys for Appellant.

Michael A. Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, Attorneys for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

In 1996, petitioner Alonzo Ferguson was convicted of first-degree premeditated murder and sentenced to life in prison. We affirmed his conviction on direct appeal. Ferguson later petitioned for postconviction relief, but the postconviction court denied the petition without an evidentiary hearing. Ferguson appealed the postconviction decision and then moved this court to stay that appeal because of the discovery of new information about the possible false testimony of a witness. We granted Ferguson's motion and Ferguson then filed an amended petition for postconviction relief. The postconviction court also denied the amended petition without an evidentiary hearing. Ferguson now appeals both denials of his petitions for postconviction relief. We affirm in part and reverse in part.

The relevant facts giving rise to Ferguson's conviction are as follows.[1] In the early morning hours of September 24, 1994, several gunshots were fired through the dining room window of a south Minneapolis home. One of those shots hit Allen Wheatley, Jr., who died later that day. Allen Jr. was from Chicago, but was visiting relatives in Minneapolis that morning together with his father, Allen Wheatley, Sr., and his cousin, Jabar Wheatley. Several members of the Wheatley family lived in Minneapolis, including: Allen Jr.'s uncle, Vincent Wheatley; Allen Jr.'s uncle and aunt, Kenneth and Angela Wheatley; and Allen Jr.'s cousin, Prentice Wheatley.

The relatives gathered at Kenneth and Angela's house and soon after they arrived, several of the men went for a walk. This group included the older brothers, Allen Sr., Kenneth, and Vincent, as well as the younger cousins, Allen Jr., Jabar, and Prentice. On their way back to Kenneth's house, the group encountered Alonzo Ferguson, a friend of Prentice. Ferguson met up with Allen Jr., Jabar, and Prentice, and the three older men returned to Kenneth's house where they went into the basement to continue visiting.

Meanwhile, on the street in front of Kenneth's house, Ferguson and the cousins had a conversation regarding the color of the shirt worn by Allen Jr. Allen Jr.'s shirt was blue and Ferguson pointed out that some people in the area, like the Rolling 30s Bloods, reacted badly to people wearing blue. Allen Jr. became angry with Ferguson, apparently because he did not appreciate being told what he could or could not wear. Prentice then left. At this point, Allen Jr., Jabar, and Ferguson were outside in front of Kenneth's house and Allen Jr. and Ferguson were arguing.

Prentice came back and prevented a fist fight between Allen Jr. and Ferguson. Ferguson then left. Allen Jr., Jabar, and Prentice began to argue among themselves. Allen Jr. apparently was upset that Prentice had not intervened on his behalf during the conversation with Ferguson.

Hearing the cousins' argument, Kenneth, Angela, Vincent, and Allen Sr. came to the door of the house and brought the cousins inside, where the argument continued. A few minutes later, Prentice left. Shortly after that, Kenneth and Vincent also left, having decided to drive to a convenience store. They went out to Jabar's car and when they reached the car, Vincent saw a person whom he identified as Ferguson running beside the house. Vincent and Kenneth followed that person around the house, but by then the person had disappeared. Vincent and Kenneth then drove off to the convenience store.

Just after Kenneth and Vincent drove off, they heard several gunshots. Because the shots sounded like they did not come from the direction of Kenneth's house, the brothers continued on to the store. Meanwhile, back at Kenneth's house, Angela, Allen Sr., Allen Jr., and Jabar were sitting around in the living room and talking. At some point, Allen Jr. got up to answer a phone call in the dining room, hung up, and was walking back toward the living room when several shots were fired through the dining room window. One of the shots hit Allen Jr. in the upper abdomen. No one saw the person or persons who fired the shots because the vertical blinds were closed, and everyone immediately fell to the floor when they heard the gunfire.

**1.** A complete factual summary can be found in Ferguson's direct appeal, *State v. Ferguson,* 581 N.W.2d 824 (Minn.1998).

Ferguson was arrested two days after the shooting, but he denied any knowledge of the shooting and was released. Almost two years later, Johnny Edwards, a former Bloods gang member and also a distant relation of Ferguson, contacted the police. Edwards informed the police that, on the morning of the murder, Ferguson told Edwards that he was going to shoot Allen Jr. Edwards also told the police that Ferguson later confessed to Edwards that he had shot Allen Jr. With this additional information, Ferguson was re-arrested and charged with Allen Jr.'s murder. Ferguson was subsequently indicted for first-degree premeditated murder in violation of Minn.Stat. § 609.05 (2000), Minn.Stat. § 609.11 (2000), and Minn. Stat § 609.185, subd. 1 (1996). After a jury trial, Ferguson was convicted of first-degree murder and sentenced to life in prison.

Ferguson raised several issues on his direct appeal to this court, but his conviction was affirmed. *Ferguson*, 581 N.W.2d at 837. Ferguson then raised several issues in his petitions for postconviction relief, which the postconviction court denied without an evidentiary hearing. Because the issues Ferguson raises in his petitions for postconviction relief involve facts related to Edwards, it is important to review additional facts that are specifically related to Edwards.

The majority of the issues Ferguson raised in his petitions involve Edwards' background, Edwards' trial testimony, and subsequent factual developments. These developments begin approximately one year after Allen Jr.'s murder when police arrested Edwards for aggravated robbery. While in custody, Edwards contacted the police and told them he had information regarding several crimes, including Allen Jr.'s murder. Edwards then made a deal with prosecutors regarding his aggravated robbery charge in exchange for this infor-

mation. He subsequently was released from custody.

In the months before he was to testify in Ferguson's trial, the state gave Edwards various forms of financial assistance, including $1,600 for set-up costs; $40 for expenses when his wife kicked him out of the house; $2,000 for hotel bills; $4,700 for food and other room charges; and miscellaneous cab fare. The state also assisted Edwards in recovering $1,400 that was seized during a prior arrest. The state disclosed to Ferguson the total amount of this financial assistance and this total was known at the time of Ferguson's trial. Ferguson's counsel eventually obtained a detailed breakdown of the financial assistance, but it is unclear from the record at what point after the trial Ferguson's counsel received this detailed breakdown.

Just before Ferguson's trial was to begin in late 1996, Edwards was once again arrested, this time with several others, on probable cause for possession of a firearm. At the time of this arrest, Edwards allegedly told the police that they would be sorry for arresting him because he was helping them clean up the neighborhood. Because of the potential conflict of interest in the Hennepin County Attorney's office, Edwards' case was transferred to Ramsey County. Ultimately, Ramsey County declined to charge Edwards in connection with this arrest. Ferguson claims that Edwards was not charged because of the state's ongoing efforts to protect Edwards' credibility as a witness at Ferguson's trial. After testifying at Ferguson's trial, Edwards was convicted of felony first-degree assault and was incarcerated out of state.

Edwards' father, John Turnipseed, visited Edwards in prison on April 29, 2000 and allegedly had a conversation with Edwards in which Edwards admitted that his testimony in Ferguson's trial was a lie. Turnipseed then contacted Ferguson's

postconviction counsel with this information. However, Ferguson had already petitioned for postconviction relief and was appealing the denial of his petition. Because of this new information, Ferguson asked this court to stay his postconviction appeal so that he could conduct further investigation into Turnipseed's claims. We granted the stay.

After further investigation, Ferguson's postconviction counsel was unable to obtain an affidavit from Edwards, who refused to discuss the matter on advice of counsel. Eventually, Ferguson submitted an amended petition for postconviction relief, together with a notarized statement from Turnipseed confirming Edwards' alleged recantation. In his affidavit, Turnipseed states that he spoke face to face with Edwards on April 29, 2000, during his monthly visit to Edwards in Kansas where Edwards is currently incarcerated. He states that Edwards told him that Edwards "had lied when he testified that Alonzo had confessed to him." The amended petition was denied without an evidentiary hearing.

Ferguson now appeals from the denial of both petitions for postconviction relief. He claims that Edwards has recanted his trial testimony and offers as proof Turnipseed's notarized statement. The record contains no evidence that Edwards was subpoenaed to testify on this issue or that he has exercised his Fifth Amendment rights. He claims that Edwards' alleged recantation entitles him to either a new trial or at a minimum an evidentiary hearing.

## I.

We review a postconviction proceeding to determine only whether sufficient evidence exists to support the postconviction court's findings. *Russell v. State,* 562 N.W.2d 670, 672 (Minn.1997). We will not disturb the postconviction court's decision unless the court abused its discretion. *Id.* A petitioner seeking postconviction relief has the burden of establishing, by a fair preponderance of the evidence, facts that would warrant relief. Minn.Stat. § 590.04, subd. 3 (2000). *See also State v. Rainer,* 502 N.W.2d 784, 787 (Minn.1993). A three-prong test, known as the *Larrison* test,[2] is applied to claims of newly-discovered evidence of falsified testimony. *Dukes v. State,* 621 N.W.2d 246, 257–58 (Minn.2001); *Sutherlin v. State,* 574 N.W.2d 428, 433 (Minn.1998). This test provides that in order to grant a new trial: (1) the court must be reasonably well-satisfied that the trial testimony was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after trial. *Sutherlin,* 574 N.W.2d at 433. We will analyze and apply each prong separately below.

### 1. First Prong: Reasonably Well Satisfied That Trial Testimony Was False

The postconviction court concluded that it was not well satisfied that Edwards' trial testimony was false based on the current record.[3] Specifically, the court first assumed that if there were a hearing, Tur-

---

**2.** We originally adopted this three-prong test in *State v. Caldwell,* 322 N.W.2d 574, 584–85 (Minn.1982). The test is commonly referred to as the *Larrison* test, after a Seventh Circuit case. *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928).

**3.** The postconviction court cited *Caldwell,* 322 N.W.2d at 584–85, the first case from this court adopting the three-prong test for newly-discovered evidence of falsified testimony. However, the court did not discuss or apply the second and third prongs, presumably because the first was not met.

nipseed would testify consistent with his notarized statement. The court then analyzed the substance of Turnipseed's hypothetical testimony and concluded that Turnipseed's testimony would be hearsay and inadmissible to prove the truth of the assertion that Edwards' trial testimony was false. The court went on to note that Edwards had already refused to make a statement and that there was no record evidence that, in an evidentiary hearing, Edwards would do anything other than deny that he lied or invoke his right to remain silent. Therefore, the court concluded that, absent a direct and clear statement from Edwards recanting his testimony, an evidentiary hearing would serve no useful purpose.

█ Ferguson disagrees with the postconviction court's characterization of Turnipseed's testimony as inadmissible hearsay. Ferguson argues that Turnipseed's testimony is admissible as a statement against penal interest. Under the rules of evidence, the statement against penal interest hearsay exception is only available when the hearsay declarant is "unavailable." Minn. R. Evid. 804(b)(3); *see also* Minn. R. Evid. 804(a) (identifying five circumstances in which a witness is considered "unavailable"). Here, Edwards is not unavailable within the meaning of the rules of evidence based either on his incarceration or his refusal to give a statement to Ferguson's attorney on advice of counsel. *See* Minn. R. Evid. 804(a). Nonetheless, if Edwards were asked to testify whether he committed perjury, he could exercise his Fifth Amendment rights. If he exercised his Fifth Amendment rights and refused to

testify, Turnipseed's testimony would then become admissible because a hearsay declarant—Edwards—is unavailable within the meaning of the rules of evidence if he exercises his right to remain silent. *See, e.g., State v. Ford,* 539 N.W.2d 214, 227 (Minn.1995); *State v. Anderson,* 284 N.W.2d 360, 361 (Minn.1979).

Ferguson has supported his allegation that Edwards lied at trial with a notarized statement from Turnipseed. Presently, this statement and any such testimony at a hearing are inadmissible hearsay. However, if an evidentiary hearing were held and Edwards was subpoenaed to testify regarding his recantation, there are several likely outcomes, two of which would result in admissible evidence that Edwards lied at Ferguson's trial. First, Edwards might invoke his Fifth Amendment right to remain silent, becoming "unavailable" so that Turnipseed's testimony falls under the hearsay exception for statements against penal interest.[4] Edwards might also admit that he lied at Ferguson's trial and formally recant his testimony under oath. However, there is also the potential that Edwards would testify to some other effect, such as he lied to his father, or his father was lying. Testimony such as this would not result in evidence that Edwards lied at Ferguson's trial because Turnipseed's statement would remain inadmissible hearsay. Nevertheless, two of the three possibilities result in admissible evidence that is relevant to whether Edwards' testimony in Ferguson's trial was false, either of which may satisfy the court that Edwards' testimony was false.

---

**4.** Under federal law, when a recanting witness takes the stand at the motion hearing and invokes his right to remain silent, motions for a new trial are denied. Wright and Miller, *Federal Practice and Procedure,* § 577.1 at 348 (1982) (citing *Newman v. United States,* 238 F.2d 861 (5th Cir.1956)). How-

ever, we have before us not only whether Ferguson is entitled to a new trial, but whether he is entitled to an evidentiary hearing. Accordingly, we do not need to decide whether a new trial should be granted solely on these grounds.

### 2. Second Prong: Difference in Jury's Conclusion Without False Testimony

Whether we are satisfied that Edwards' trial testimony was false is only the first prong in the three-prong *Larrison* test for newly-discovered evidence of false testimony. Ferguson also must show that, without the false testimony, the jury might have reached a different conclusion. *Sutherlin*, 574 N.W.2d at 433. Under this second prong of the *Larrison* test, we must answer the question whether, without Edwards' allegedly false testimony, the jury *might* have reached a different conclusion. *Caldwell*, 322 N.W.2d at 585. This second prong is less stringent than what is required for new trials based on new evidence that does not involve falsified testimony; that standard requires that a jury *probably* would have reached a different result in another trial. *Id.* Here, Ferguson claims that Edwards' testimony was the lynchpin in a wholly circumstantial case.

A review of the record shows that Edwards' testimony was a substantial part of the state's case against Ferguson. First, Edwards testified that on the morning of the shooting, he saw that Ferguson had a gun and that Ferguson told him that he was going to kill Allen Jr. Second, Edwards testified that later that same day Ferguson told Edwards that he had seen Allen Jr.'s shadow in the window and that he shot him. Without this testimony, the only other evidence tying Ferguson to the crime was that: (1) Ferguson and Allen Jr. had a confrontation 20 to 30 minutes before the shooting; and (2) Vincent Wheatley testified that he saw Ferguson on the side of the house minutes before the shooting. Given that the state's case against Ferguson without Edwards' testimony consists of a confrontation with Allen Jr. before the shooting and an identification of Ferguson near the house before the shooting, it is quite possible, maybe even probable, that the jury might have reached a different verdict.

### 3. Third Prong: Surprised by False Testimony

Under the third prong of the *Larrison* test, Ferguson must show that he was surprised by the false testimony at trial or did not know of the falsity until after trial. *Sutherlin*, 574 N.W.2d at 433. It is undisputed that Ferguson learned of Edwards' alleged recantation after trial. In fact, it was not until after Ferguson appealed from the denial of his first petition for postconviction relief that he learned, through Turnipseed, of Edwards' alleged recantation. Edwards' testimony was that Ferguson had confessed to him. If no such conversation took place, Ferguson knew of the falsity of Edwards' testimony from the time of Edwards' testimony at trial, if not before.

If the third prong is applied literally, the test for granting a new trial could never be satisfied in situations in which a witness later recants his testimony regarding matters within the personal knowledge of the defendant. Accordingly, some federal courts that have adopted the *Larrison* test have questioned whether the third prong should be an absolute requirement for granting a new trial. *United States v. Willis*, 257 F.3d 636, 648 (6th Cir.2001); *United States v. Leibowitz*, 919 F.2d 482, 484–85 (7th Cir.1990); *Gordon v. United States*, 178 F.2d 896, 900 (6th Cir.1949). For example, Judge Posner writing for the Seventh Circuit—the first circuit to adopt the *Larrison* test—noted that the absolute requirement of the third prong was dictum. *Leibowitz*, 919 F.2d at 485 (discussing *Larrison*, 24 F.2d at 87–88).[5] Judge

---

**5.** Nevertheless, several years after Posner's opinion in *Leibowitz,* another panel from the

Posner acknowledged that surprise was relevant, but concluded that it should not be an absolute condition precedent to granting a new trial, especially in cases where

> the principal (though not the only) evidence of guilt is the testimony of an accomplice or eyewitness, the only resource of the defendant in unmasking the falsity, even with all the advance warning in the world, may be cross-examination, which—much mythology to the contrary notwithstanding—is not an infallible lie detector.

*Leibowitz,* 919 F.2d at 484. Judge Posner also noted that he had "found only one case in which the absence of surprise alone barred acceptance of an otherwise truthful-seeming recantation." *Id.*[6]

We agree with Judge Posner's conclusion that *Larrison's* third prong should not be an absolute condition precedent to granting a new trial. We find support for this conclusion in our case law. In Minnesota, failure to meet the third prong has never been relied upon to deny a new trial. Instead, new trials generally have been denied based upon failure to satisfy the first and second prongs. *See, e.g., State v. Erdman,* 422 N.W.2d 511, 512 (Minn.1988) (denying new trial based on first prong); *Morgan v. State,* 384 N.W.2d 458, 460 (Minn.1986) (denying new trial based on second prong). Whether the defendant was surprised or discovered the false testimony after trial can be a relevant concern when determining whether to grant a new trial. To ignore this factor would serve to encourage defendants to "sit" on false testimony at trial or fail to investigate the veracity of a witness and bring it to the court's attention only in postconviction proceedings in the hope of getting a new trial. Nevertheless, we see no reason why, when it is asserted that the defendant must have known that the testimony was false, this factor alone should be a basis to deny the defendant a new trial when there is an alleged recantation by the state's primary witness to an alleged confession by the defendant.

■ In cases such as this involving an alleged confession and in situations where eyewitnesses or accomplices allegedly present false testimony, surprise regarding the falsity of the testimony is never a possibility because a defendant would have personal knowledge of the circumstances. As a result, under the traditional *Larrison* test, such defendants would be unable to satisfy the test for a new trial based on a witness's recantation of false testimony. Therefore, we conclude that the third prong of the *Larrison* test, that a petitioner be taken by surprise at trial or not have known of the falsity of the testimony until after trial, is not an absolute condition precedent to a court granting a new trial based on falsified testimony.

## II.

■ Having clarified the *Larrison* test for claims of newly-discovered evidence of falsified testimony, we next address Ferguson's claim that he is entitled to a new trial or at a minimum a postconviction evidentiary hearing because Edwards provided false testimony. For us to grant Ferguson a new trial, he must establish, by a fair preponderance of the evidence, facts that would entitle him to a new trial

Seventh Circuit discussed and applied the three-prong test as if the third prong were a necessary requirement. *United States v. Austin,* 103 F.3d 606, 609–10 (7th Cir.1997).

6. Posner cites *United States v. Dworkin,* 116 F.R.D. 29 (E.D.Va.1987), and refers to it as "a doozy." In *Dworkin,* the defendant alleged that his own purposely false testimony was false and required a new trial. *Id.* at 30–31.

under the *Larrison* test. Minn.Stat. § 590.04, subd. 3 (2000); *see also Rainer,* 502 N.W.2d at 787. He has not done so based on the facts before us. A court could not be reasonably well-satisfied that Edwards' trial testimony was false based on Turnipseed's statement alone. Therefore, we conclude that Ferguson has not established that he is entitled to a new trial.

Ferguson is, however, entitled to an evidentiary hearing on a significantly lesser showing than what is required for us to grant him a new trial. Our standard of review for the denial of a postconviction evidentiary hearing allows us to reverse a postconviction court only for an abuse of discretion. *Russell,* 562 N.W.2d at 672. An evidentiary hearing is required "whenever material facts are in dispute that * * * must be resolved in order to determine the issues raised on the merits." *Hodgson v. State,* 540 N.W.2d 515, 517 (Minn.1995). Allegations in a postconviction petition must be "more than argumentative assertions without factual support." *Beltowski v. State,* 289 Minn. 215, 217, 183 N.W.2d 563, 564 (1971). But any doubts whether an evidentiary hearing is necessary should be resolved in favor of the party requesting the hearing. *State ex rel. Roy v. Tahash,* 277 Minn. 238, 244, 152 N.W.2d 301, 305 (1967). Additionally, evidentiary hearings are particularly appropriate when postconviction allegations attack evidence that was very important to the state's wholly circumstantial case. *See State v. Rhodes,* 627 N.W.2d 74, 88 (Minn. 2001). Thus, in order to prevail on his request for a hearing, Ferguson must allege facts that would, if proved by a fair preponderance of the evidence, entitle him to relief. *Roby v. State,* 531 N.W.2d 482, 483 (Minn.1995).

Ferguson has alleged that Edwards lied at trial which, if proved, would satisfy the first two prongs of the *Larrison* test. More particularly, Ferguson has provided a potentially admissible notarized statement by Turnipseed that Edwards lied at trial and has asserted that Edwards' testimony was so essential to the state's case against him that without the false testimony the jury might have reached a different conclusion. Ferguson has also alleged facts that indicate that the third prong of the *Larrison* test is not particularly relevant to his situation and that it should not bar his claim. As we concluded above, the absence of surprise will no longer bar a claim for relief. Further, the state's case against Ferguson was wholly circumstantial. Edwards' testimony was pivotal to Ferguson's conviction; thus, he has alleged material facts that, if proved by a fair preponderance of the evidence, would satisfy the *Larrison* test for a new trial. Therefore, we hold that the postconviction court abused its discretion when it denied Ferguson's request for an evidentiary hearing. Accordingly, we reverse and remand for an evidentiary hearing on the issue of whether Ferguson is entitled to a new trial on the grounds that Edwards recanted his trial testimony.

### III.

Ferguson also claims that he is entitled to a new trial or an evidentiary hearing because he has newly-discovered evidence that Vincent Wheatley testified falsely at trial. Specifically, Ferguson argues that he has an affidavit from Prentice Wheatley stating that on several occasions after the murder but before trial Vincent told Prentice that Vincent could not identify the person whom Vincent had seen running from the house just before the murder, and that Vincent had not seen the person's face. However, this "affidavit" is unsigned. In contrast, Vincent testified at trial that he recognized Ferguson as the

person running beside the house just before the murder.

The postconviction court applied a four-part test to determine whether a new trial was required upon this discovery of new evidence. The court applied the test for newly-discovered evidence found in *Rainer v. State*, 566 N.W.2d 692, 695 (Minn.1997), which requires that (1) the evidence was not known to the defendant or his counsel at the time of trial; (2) the evidence could not have been discovered through due diligence before trial; (3) the evidence is not cumulative, impeaching, or doubtful; and (4) the evidence would probably produce an acquittal or a more favorable result. The court concluded that Ferguson was not entitled to a hearing or a new trial because Ferguson could not meet the third part of the test. Specifically, the court noted that even if Prentice signed an affidavit or testified at a new trial, his testimony would only be offered as impeachment against Vincent—failing to satisfy the third part of the test.

However, as we noted previously, the proper test to apply when evaluating a claim for a new trial based on newly-discovered evidence of falsified testimony is the three-prong *Larrison* test. *Dukes*, 621 N.W.2d at 257–58; *see also Sutherlin*, 574 N.W.2d at 433 (making the distinction between the three-prong test and the four-part test). When there are factual disputes on a claim and the postconviction court erred when it applied the four-part test instead of the *Larrison* test, it is appropriate to remand for application of the *Larrison* test. *Dukes*, 621 N.W.2d at 258.

However, remanding the Prentice/Vincent claim may be unhelpful given the weakness of the new evidence under the *Larrison* test. More specifically, with respect to the first prong, it appears unlikely that a postconviction court could be well-satisfied that Vincent's testimony was false because there is no factual support or evidence for Ferguson's claims. Ferguson has not submitted an affidavit or even a notarized statement. Additionally, unlike Turnipseed's statement, the Prentice/Vincent claim does not present the possibility of a witness recanting his testimony; instead, there is only a possibility that another witness would testify that Vincent was lying and had changed his story. It is questionable whether Prentice would sign an affidavit or testify at a hearing or new trial given that he was (1) the murder victim's first cousin, (2) unwilling to sign an affidavit for purposes of the motion for postconviction relief, and (3) subpoenaed to testify at Ferguson's trial but never responded. To obtain an evidentiary hearing on a postconviction petition, petitioners must present facts in support of their claims—"more than argumentative assertions without factual support." *Beltowski*, 289 Minn. at 217, 183 N.W.2d at 564.

Whether the second prong—possibility that the jury would return a different verdict—would be satisfied is also questionable. Unlike Edwards' testimony, which consisted of Ferguson's statement of intent to commit murder and his later confession, Vincent's testimony only puts Ferguson near the scene of the crime at the right time. Thus, it appears that Ferguson's conviction rests much less on Vincent's testimony than on that of Edwards. We would ordinarily conclude that a remand for an evidentiary hearing regarding Vincent's testimony would serve no useful purpose because Ferguson appears unable to make a prima facie case under the *Larrison* test. However, because the postconviction court applied the incorrect legal standard and because we are remanding for an evidentiary hearing regarding Edwards' testimony, we conclude that the postconviction court should also

hold an evidentiary hearing regarding the allegedly false testimony of Vincent Wheatley.

## IV.

■ In addition to his claims of falsified trial testimony, Ferguson raised several other claims in his petition for postconviction relief, including claims that the state used false and misleading testimony and that the state failed to disclose material and exculpatory evidence in violation of the Fourteenth Amendment. Specifically, Ferguson claims that Edwards lied under oath about (1) Edwards' membership in the Bloods gang; (2) carrying a gun; (3) Edwards' continuing criminal activity; (4) Edwards' arrest in 1996; and (4) the benefits Edwards was receiving for his cooperation with the state. Ferguson also claims that the state failed to disclose (1) the specific amounts and actual breakdown of the total financial assistance it provided to Edwards, and (2) the state's "ongoing efforts to protect Edwards from criminal prosecution for the possession of a firearm" stemming from Edwards' 1996 arrest.

■ Once a direct appeal has been taken, we will not consider any issue raised in that appeal or any claims known at that time but not raised. *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976). Such claims are also barred by this rule if the petitioner knew or should have known about the issue at the time of appeal. *Black v. State*, 560 N.W.2d 83, 85 (Minn. 1997). Several of Ferguson's claims are without merit because they involve allegedly false testimony given in other proceedings. The majority of Ferguson's other claims are barred by *Knaffla* because Ferguson either knew or should have known of these claims at the time of his direct appeal. Finally, with respect to Ferguson's claim that Edwards lied about the benefits he received for his cooperation and with respect to Ferguson's claim that the state failed to disclose exculpatory evidence, Ferguson has failed to meet his burden. In particular, Ferguson did not provide the postconviction court with any evidence that he learned of the latter claims after his direct appeal. Accordingly, we hold that the postconviction court did not abuse its discretion when it concluded that Ferguson was not entitled to postconviction relief with respect to these claims.

## V.

■ Finally, Ferguson argues that his appellate counsel provided ineffective assistance to the extent that we decline to address any issues based on *Knaffla*. Essentially, Ferguson argues that if we determine that any issues are barred from consideration at this time because they were known but not raised at the time of Ferguson's direct appeal, then his appellate counsel provided ineffective assistance by failing to raise the issues on direct appeal.

Ferguson raises this ineffective assistance of appellate counsel claim in his brief to this court. However, Ferguson did not raise this issue in either of his two petitions for postconviction relief. We generally will not consider arguments made for the first time on appeal. *State v. Kremer*, 307 Minn. 309, 313, 239 N.W.2d 476, 478 (1976). This procedural bar applies even in postconviction proceedings raising constitutional issues of criminal procedure. *Id.* In our discretion, we may consider issues raised for the first time on appeal when the interests of justice require their consideration and addressing them would not work an unfair surprise on a party. *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989).

Because our standard of review of a postconviction court's decision is limited to

whether there is record support for its findings, proper review of Ferguson's ineffective assistance of counsel claim is impossible because the postconviction court made no findings on this issue. Further, review of this issue does not appear to be in the interests of justice because Ferguson can raise this issue in another petition for postconviction relief and allow the postconviction court to first address the issue. Finally, given the general rule that we will not consider issues raised for the first time on appeal, the state did not address the ineffective assistance of counsel issue on its merits. Accordingly, we will not address Ferguson's claim at this time.

Affirmed in part and reversed in part. Remanded to the postconviction court for further proceedings in accordance with this opinion.