**Brian Keith HOOPER, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. A03–849.

Supreme Court of Minnesota.

May 27, 2004.

Jeffrey C. Dean, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Patrick C. Diamond, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

PAGE, Justice.

In a jury trial before Hennepin County District Court Judge Patricia Kerr Karasov, Brian Keith Hooper was convicted of three counts of first-degree murder for the 1998 death of Ann Prazniak. Hooper was sentenced to three concurrent life sentences. Hooper's direct appeal was stayed to allow him to seek postconviction relief based on his claim of newly discovered evidence. After Hooper was denied postconviction relief, this court reinstated Hooper's direct appeal and affirmed both his conviction and the postconviction court's denial of relief.[1] *State v. Hooper,* 620 N.W.2d 31, 40–41 (Minn.2000).

On March 11, 2003, Hooper filed a second petition for postconviction relief that was assigned to Judge Karasov. On March 28, 2003, Hooper's counsel, Jeffrey Dean, filed a notice to remove Judge Karasov and wrote Hennepin County Chief Judge Kevin Burke a letter requesting that the matter be reassigned pursuant to the notice to remove. That same day,

Dean met with the chief judge regarding the request for reassignment. On April 15, 2003, the chief judge wrote Dean a letter informing him that the matter would not be reassigned and that his choices were to either proceed with the postconviction proceeding before Judge Karasov or to file a motion to remove her for cause. On May 8, Judge Karasov denied Hooper's petition for postconviction relief without an evidentiary hearing. On May 12, 2003, Hooper filed a motion to remove Judge Karasov for cause. By order filed June 19, 2003, the chief judge denied Hooper's motion to remove Judge Karasov for cause. In the memorandum accompanying the order, the chief judge noted first that, under Minn. R. Crim P. 26.03, subdivision 13(4), "No notice to remove shall be effective against a judge who has already presided at the trial * * * except upon an affirmative showing of cause [on the part of the judge]." The chief judge went on to note that, because Judge Karasov presided at trial, Hooper was required to make an affirmative showing of cause, which he failed to do. Specifically, he noted that there were no facts suggesting that Judge Karasov's "conduct revealed actual bias or the appearance of bias to such a degree that Petitioner was denied a fair hearing."

In this appeal, Hooper makes four arguments: first, Judge Karasov did not have jurisdiction to decide the second petition for postconviction relief due to the pending notice to remove; second, the chief judge wrongly denied his motion to remove Judge Karasov; third, the postconviction court abused its discretion by denying his petition for a new trial based on newly discovered evidence and recanted trial testimony without conducting an evidentiary hearing; and, fourth, his due process and

---

1. The facts of the underlying conviction are set forth in detail in the court's opinion in *State v. Hooper,* and will be referenced in this opinion only as necessary to aid in the resolution of the issues presented in this appeal.

fair trial rights were violated by both the denial of a new trial and by the fact that a biased judge ruled on the second petition for postconviction relief.[2] We affirm.

■ Our review of postconviction proceedings is limited to determining whether there is sufficient evidence to support the findings of the postconviction court. *State v. Rainer*, 502 N.W.2d 784, 787 (Minn. 1993). We will not disturb those findings absent an abuse of discretion. *Ferguson v. State*, 645 N.W.2d 437, 446 (Minn.2002). In order to receive a new trial, the petitioner must establish by a preponderance of the evidence facts that would warrant re-opening the case. *State v. Rhodes*, 627 N.W.2d 74, 86 (Minn.2001). An evidentiary hearing is required "unless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2002); *see Ferguson*, 645 N.W.2d at 446 (stating that a hearing is required when "facts [are alleged] that would, if proved by a fair preponderance of the evidence, entitle [one] to relief").

### I.

■ "No notice to remove shall be effective against a judge who has already presided at the trial, * * * except upon an affirmative showing of cause on the part of the judge." Minn. R.Crim. P. 26.03, subd. 13(4). A postconviction proceeding is an extension of the criminal prosecution. *Johnson v. State*, 486 N.W.2d 825, 827 (Minn.App.), *rev. denied* (Minn. Aug. 27, 1992). Therefore, once the parties have already appeared before the judge, there is no automatic removal as of right in a

postconviction proceeding. *See id.*, 486 N.W.2d at 827–28.

■ Here, Judge Karasov presided at Hooper's trial and first postconviction petition and was assigned the second petition. On March 28, 2003, Hooper filed a "Notice to Remove" Judge Karasov, using a form typically used by prosecutors to remove a judge as of right. That same day, Dean spoke with the chief judge, with counsel for the state present, in addition to writing the chief judge a letter requesting that the matter be reassigned pursuant to the notice to remove. According to the letter and an affidavit submitted by Dean, the basis for seeking Judge Karasov's removal was bias on her part. On April 15, 2003, the chief judge wrote Hooper a letter informing him that he would not reassign the matter. The chief judge also informed Hooper that his only options at that point were to either proceed with the postconviction proceeding or to file a motion to remove Judge Karasov for cause. No motion to remove Judge Karasov for cause was forthcoming and on May 8, 2003, Judge Karasov denied Hooper's petition for postconviction relief. On May 12, 2003, Hooper filed a motion to remove Judge Karasov for cause, which the chief judge denied on June 19, 2003. In denying the motion to remove for cause, the chief judge found that "there [were] no facts to suggest that Judge Karasov's conduct revealed actual bias or the appearance of bias to such a degree that [Hooper] was denied a fair hearing."

As indicated, Minn. R.Crim. P. 26.03, subd. 13(4), governs Hooper's two notices to remove Judge Karasov. Under the rule, Hooper's March 28, 2003, notice to

---

2. In addition to the issues raised, Dean has also filed a motion for sanctions, requesting that the state be sanctioned for making false and disparaging comments about him in its brief and for misrepresenting the record and

the law to this court. Based on our review of the record and the parties' briefs, we conclude that there is no basis to impose sanctions on the state and therefore deny Dean's motion.

remove was properly denied by the chief judge because Judge Karasov had presided at Hooper's trial and there was no automatic right to remove her. We also conclude that Hooper's May 12, 2003, motion to remove Judge Karasov for cause was properly denied. We reach that conclusion for two reasons: (1) the May 12, 2003, motion was not timely; and (2) we are satisfied that the conduct attributed to Judge Karasov does not reasonably support Hooper's claim of actual judicial bias or the appearance of judicial bias.

The chief judge's letter of April 15, 2003, put Hooper on notice that Hooper's postconviction petition was not going to be reassigned and his choices were to either proceed with the petition or move to have Judge Karasov removed for cause. More than three weeks later and almost two months after Hooper's postconviction petition was filed, Judge Karasov denied the petition without a hearing. At the time, no motion to remove, either as of right or for cause, was pending.[3] Thus, when Hooper's May 12, 2003, notice to remove for cause was filed, it was not timely.

■ Normally, having concluded that Hooper's motion to remove for cause was untimely, we would not address the merits of the motion. We choose, however, to do so here. A motion to remove for cause is committed to the discretion of the trial court and this court will reverse only for an abuse of that discretion. *Uselman v. Uselman*, 464 N.W.2d 130, 139 (Minn. 1990). A motion to remove a judge for cause is procedural and is therefore governed by the rules of criminal procedure. *State v. Azure*, 621 N.W.2d 721, 724 (Minn. 2001). Under the rules, "[n]o judge shall preside over a trial or other proceeding if that judge is disqualified under the Code

of Judicial Conduct." Minn. R.Crim. P. 26.03, subd. 13(3). The Code of Judicial Conduct provides that judges shall disqualify themselves "in [ ] proceeding[s] in which [a] judge's impartiality might reasonably be questioned." Minn.Code Jud. Conduct, Canon 3(D)(1). While removal is warranted when the judge's impartiality might reasonably be questioned, a petitioner's subjective belief that the judge is biased does not necessarily warrant removal. *State v. Laughlin*, 508 N.W.2d 545, 548 (Minn.App.1993).

■ Hooper argues Judge Karasov was biased because she was angry that Hooper had filed an affidavit from an alternate juror with this court in which the alternate juror said that Judge Karasov stated that she thought the state did not have a case against Hooper. Dean contends that Judge Karasov's anger is manifested by her hostile body language toward him and the fact that Judge Karasov would not discuss the matter with him at a social function.

Hooper's motion to remove Judge Karasov for cause has little merit. In exercising his discretion in denying Hooper's motion, the chief judge indicated that Judge Karasov's refusal to discuss the matter may have been an effort to avoid a potentially inappropriate ex parte communication. In that Judge Karasov had presided at trial and any subsequent postconviction proceedings would likely be assigned to her, any ex parte communications with Dean discussing matters related to Hooper's trial would have been inappropriate. Further, as the chief judge pointed out, other courts have concluded that the fact that a judge displays irritation toward or disapproval of counsel does not ordinarily

---

3. Because no motion to remove Judge Karasov was pending on May 8, 2003, there can be no question as to whether Judge Karasov had jurisdiction to rule on Hooper's postconviction petition.

justify disqualification. *See Nat'l Union Fire Ins. Co. v. Cont'l Illinois Corp.*, 639 F.Supp. 1229, 1236 (N.D.Ill.1986) (noting that antipathy towards counsel is no reason for disqualification); *see also In re Cooper*, 821 F.2d 833, 844 (1st Cir.1987) (stating that judge's statement indicating disapproval of counsel did not give rise to a question of partiality against the defendants personally). Therefore, on the record presented, we cannot conclude that the chief judge abused his discretion in denying Hooper's motion to remove Judge Karasov for cause.

## II.

■ In order to obtain a new trial based on recanted trial testimony, a convicted defendant must satisfy the three-part test we adopted from the 7th Circuit Court of Appeals' opinion in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928), *overruled by U.S. v. Mitrione*, 357 F.3d 712, 718 (7th Cir.2004). *State v. Caldwell*, 322 N.W.2d 574, 584–85 (Minn.1982). Under that test, the following three prongs of *Larrison* must be established: "(1) the court must be reasonably well-satisfied that the trial testimony was false; (2) without the false testimony the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after the trial." *Ferguson*, 645 N.W.2d at 442. We have said that this last factor is not a precondition to granting a new trial. *Id.* at 445.

■ Hooper contends that witnesses Calvin King's and Cardnel Brown's recantations of their trial testimony entitle him to a new trial. At a minimum, he contends he is entitled to an evidentiary hearing to determine the issue. At trial, King testified that on April 9, 1998, he and Hooper bought drugs together at an apartment at 1818 Park Avenue South, in the same building that Prazniak's apartment was located. King testified that Hooper proposed getting high in an apartment at the building, but that they went to King's house instead. After getting high, Hooper told King he was glad they did not go to the place he had suggested because it smelled. According to King, Hooper then said, "Man, I did some f——ed up sh-t * * * I had to kill the motherf——er * * * Me and my girl * * * For real. A old bitch on top of it." King testified that when he later saw Hooper at the Hennepin County Jail, Hooper told him that he was being held for a burglary connected to the crime he had told King about previously.

Hooper's assertion that King recanted his trial testimony is based on an affidavit he submitted from Richard Virnig, an individual who accompanied Dean to an interview with King at the Hennepin County Adult Detention Center on July 2, 2001. According to Virnig's affidavit, dated July 11, 2001, Dean told King that he did not believe King's trial testimony was true and did not believe that Hooper ever told King that Hooper had anything to do with the murder. According to paragraph 6 of the affidavit, "Mr. King did not deny that his testimony implicating Hooper was untrue and at no time did Mr. King ever say his (Mr. King's) testimony was true." Paragraph 7 of the affidavit states, "Mr. Dean then stated to Mr. King that since Mr. King was not denying his testimony was untrue, it must not have been true. Mr. King nodded his head affirmatively, indicating to Mr. Dean that his testimony was not true." Thus, the contention is that King's nod of the head in response to Dean's statement clearly indicates that King's trial testimony was false. Finally, according to Virnig's affidavit, King stated that he would provide a statement admitting his trial testimony was untrue once some pending charges against him were

resolved. No such statement, however, is contained in the record before us.

The postconviction court applied the *Larrison* test to Hooper's recantation claims. With respect to Virnig's affidavit regarding King's trial testimony, the postconviction court indicated that none of the conversation set out in the affidavit "ha[d] King recanting his trial testimony or stating that his trial testimony was false." Thus, the postconviction court was "not well-satisfied that King's trial testimony was false." The postconviction court, based on the evidence presented at trial, was also not satisfied that the jury would have reached a conclusion other than guilt even if King's trial testimony had been excluded.

Generally, to "recant" means "to withdraw or renounce (prior statements or testimony) formally or publicly." Black's Law Dictionary 1274 (7th ed.1999). Here, King's alleged recantation is based on nothing more than Virnig's interpretation of King's body language in response to Dean's leading question, King's failure to deny that his trial testimony was untrue, and King's failure to say that his testimony was true. In our view, on these facts, King's silence does not rise to the level of either formal or public withdrawal or renunciation of his trial testimony. Because King's silence, on its face, does not rise to the level of a withdrawal or renunciation of his trial testimony, the first prong of the *Larrison* test has not been met. Therefore, we conclude that Hooper is not entitled to relief based on the alleged recantation of King's trial testimony and hold that the postconviction court did not err when it denied Hooper relief without conducting a hearing with respect to King's alleged recantation of trial testimony.

At trial, Brown testified about conversations he had with Hooper while they were both being held at the Hennepin County Workhouse in May of 1998. Brown testified that Hooper told him he was selling drugs and prostitutes out of Prazniak's apartment. According to Brown, Hooper said that he and a "female associate" were roaming the hallway at 1818 Park when a woman came out to see what was going on and that he pushed the woman in the face, knocking her unconscious. Brown then testified that Hooper told him he wrapped the victim in bedding and plastic, placed her in a box, and put the box in the closet. In a sworn, handwritten affidavit, dated January 10, 2003, Brown stated that Hooper never admitted any role in or connection to Prazniak's murder, that Hooper said he was getting high in the apartment and did not know there was a body in the apartment, and that Brown's statement to the police and his testimony at trial were untrue.

 In applying the *Larrison* test to Brown's alleged recantation, the postconviction court noted that normally a hearing to assess the accurateness of the recantation would be required. The postconviction court found, however, that on the facts presented no hearing was necessary because, even without Brown's testimony, the strength of the other evidence presented at trial was such that the jury would not likely have reached a different conclusion. Thus, the postconviction court concluded that Hooper was not entitled to relief based on Brown's recantation because he failed to satisfy the second prong of *Larrison*.

Hooper contends, relying on *Ferguson v. State*, that at a minimum he is entitled to an evidentiary hearing related to Brown's recanted trial testimony. In *Ferguson*, the state's key witness allegedly admitted to his father that his trial testimony implicating the defendant in the charged crime was false. 645 N.W.2d at 441. Noting that the allegedly false testimony was piv-

otal to the conviction and that, if proved false, the second prong of *Larrison* would be satisfied, we held that the appellant was entitled to an evidentiary hearing on the newly discovered evidence. *Id.* at 446. In contrast, we declined to grant any relief in *Morgan v. State,* 384 N.W.2d 458, 460 (Minn.1986), a case involving a key witness's recanted trial testimony that went to the witness's credibility as opposed to the defendant's guilt. We concluded that there was other convincing evidence of the defendant's guilt and, therefore, even without the witness's recanted testimony the jury would not have reached a different conclusion. *Id.*

This case is distinguishable from both *Morgan* and *Ferguson.* Unlike *Morgan,* the recanted testimony went directly to Hooper's guilt. Unlike *Ferguson,* however, the testimony was not pivotal to Hooper's conviction. There was ample evidence independent of Brown's testimony implicating Hooper in Prazniak's murder.

Two witnesses, Lolita Fairley and Lucas James, both testified that Hooper confessed to them. *Hooper,* 620 N.W.2d at 36. Hooper's statement to the police placed him in Prazniak's apartment and his fingerprints were found on plastic bags and a beer can in the apartment. *Id.* at 34–35. Prazniak's wrists, nose, and mouth were covered with tape similar to the tape that Chalaka Lewis, another of the state's trial witnesses, testified Hooper made her tear off when they were alone in Prazniak's apartment. *Id.* Also, the box containing Prazniak's remains was wrapped in a string of Christmas lights. *Id.* at 34. This supports Lewis's testimony that she picked up garbage, including Christmas lights, from Prazniak's bedroom after Hooper, who Lewis alleged was in the bedroom with the victim, left the bedroom, and told Lewis to clean it up. *Id.* at 35. Thus, we are satisfied that Hooper has failed to

establish that, without Brown's testimony, the jury might have reached a different conclusion. We therefore conclude that the postconviction court did not abuse its discretion in denying Hooper an evidentiary hearing on that basis.

### III.

■ We next consider Hooper's argument that the postconviction court abused its discretion by refusing to grant a new trial based on newly discovered evidence without conducting an evidentiary hearing. A new trial may be granted based on newly discovered evidence when: (1) the evidence was not known to the defendant or counsel at trial; (2) the failure to learn of the evidence before trial was not due to a lack of diligence; (3) the evidence is material, not merely impeaching, cumulative, or doubtful; and (4) the evidence will probably result in either an acquittal or a more favorable result for the defendant. *Woodruff v. State,* 608 N.W.2d 881, 888 (Minn.2000).

Hooper's newly discovered evidence claim involves statements attributed to Vonda Quass in two affidavits submitted by Sara Gallagher, one of Hooper's attorneys. These affidavits were a result of an interview that Gallagher, along with Dean, conducted with Quass at the Taycheedah Correctional Facility located in Fond Du Lac, Wisconsin, on January 24, 2003. At trial, Quass asserted her Fifth Amendment right against self-incrimination and did not testify. Hooper sought to introduce a videotape of an interview Quass gave to the police on May 4, 1998. In the interview, Quass admitted being in Prazniak's apartment to smoke crack and recounted a conversation she had with a resident of 1818 Park about the foul odor in the building, from which she and the resident concluded Prazniak was dead in her apartment and that they should call 911. When the police

asked Quass why she did not call 911, she responded, "That was two weeks after she died!" When asked how she knew when Prazniak died, Quass replied, "the whole building knew." The state objected to admitting the videotape into evidence. In response, Hooper argued that Quass's statements on the tape showed that she knew the date of Prazniak's death, something only the killer would know. Ultimately, the court excluded the videotape of Quass's police interview, concluding that Quass's statements were irrelevant hearsay.

In his direct appeal, Hooper argued that the trial court improperly excluded Quass's videotaped statement. *Hooper*, 620 N.W.2d at 38. In essence, Hooper claimed that Quass's statement, "That was two weeks after she died!," tended to show Quass knew the date of Prazniak's death, information only the murderer or an accomplice would know, and that, as such, this statement should have been admitted as a statement against interest. *Id.* In evaluating this claim, we noted:

> Quass did not admit to personal knowledge regarding Prazniak's death or her murder in the videotaped interview conducted more than two weeks after police discovered Prazniak's body. She referred to the smell in the hallways and a comment made to her by the "girl that lives next door to Lindsay," but made no reference to timeframe, crime committed, or knowledge of any details of the crime. Importantly, she denied any involvement in the murder.

*Id.* Thus, we concluded that the trial court did not abuse its discretion in excluding Quass's videotaped interview as irrelevant and not a statement against interest. *Id.* at 39.

In her first affidavit, dated January 29, 2003, Gallagher states that during the January 24, 2003, interview when she asked Quass about the murder and her relationship with Chalaka Lewis, Quass said, "we were lucky to have been charged only with burglary since we could have been charged with murder." According to Gallagher, when asked to explain this statement, Quass said she remembered what happened the night of the murder as well as the fact that Lewis was living with Prazniak before Prazniak was murdered. When Gallagher asked Quass to explain how Prazniak died, Quass allegedly stated that Prazniak died on April 1, and that "Prazniak was probably duct taped and wrapped up in plastic bags while she was still alive." Gallagher's affidavit indicates that Quass admitted to staying in Prazniak's apartment knowing that Prazniak was dead in the apartment and that Quass knew Prazniak was dead before her body was discovered "since the whole place smelled." When Gallagher asked her why she would conclude that a bad odor meant that Prazniak was dead in her apartment, Quass allegedly altered her story, saying that she knew Prazniak was dead in the apartment because a neighbor told her so. When told that Prazniak's neighbors had been calling the police about Prazniak's whereabouts, Quass then said that she did not know how she knew that Prazniak was dead in her apartment. Quass then allegedly told Gallagher that she wanted to call 911 but was "too high on crack to make the call." Paragraph 3 of Gallagher's second affidavit, dated January 30, 2003, states, in reference to the January 24, 2003, interview with Quass, "At the beginning of our conversation, I stated that we did not believe that [ ] Hooper was guilty of Ms. Prazniak's murder. By direct and indirect statements throughout the two hour interview [on January 24, 2003], Ms. Quass indicated that Mr. Hooper was not, in any way, connected with the murder of Ms. Ann Prazniak."

With respect to Gallagher's January 29 affidavit, the postconviction court found that "[t]he Petitioner fails to demonstrate how the information obtained in this interview as relayed in these affidavits is newly discovered or unique to Prazniak's killer." The court also found that Quass made no mention of Hooper in the affidavit, that Quass did not admit guilt on her part for Prazniak's death, and that the information Quass provided on January 24 was just as "inconclusive, confusing, and unreliable" as the information she gave in her videotaped statement to the police. With respect to the January 30 affidavit, the postconviction court found the statement in paragraph 3 to be speculative and insufficient to support the grant of either an evidentiary hearing or a new trial.

Like the postconviction court, we also find the statements attributable to Quass in the two Gallagher affidavits to be "inconclusive, confusing, and unreliable." While it is true that the statements attributed to Quass in the January 29 Gallagher affidavits contain statements that were not made in her earlier videotaped statement to the police, it is unclear how those statements are any more relevant than the ones we held on direct appeal to have been properly excluded. Importantly, the statements attributed to Quass in the affidavits neither contain any admission of guilt on Quass's part nor do they exculpate Hooper. Indeed, they do not make any reference to Hooper. Because we agree with the postconviction court that the statements attributed to Quass in the Gallagher affidavits are "inconclusive, confusing, and unreliable," we conclude that Hooper's claims concerning newly discovered evi-

dence related to Quass are immaterial and doubtful and therefore fail the third prong of the test for granting a new trial based on newly discovered evidence. *Woodruff,* 608 N.W.2d at 888. Thus, we hold that the postconviction court did not err when it denied this claim without holding an evidentiary hearing.[4]

Affirmed.

---

4. In light of our conclusion that the chief judge did not abuse his discretion in denying Hooper's motion to remove Judge Karasov for cause and our conclusion that the postconviction court did not abuse its discretion in denying Hooper's claims without conducting an evidentiary hearing, Hooper's claim that his due process and fair trial rights were violated by the fact that a biased judge ruled on his second petition for postconviction relief and by the denial of a new trial is rejected without further discussion.